## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **BAXTER INTERNATIONAL, INC.,** ) | |
| ) | **Case No. 17 C 7576** |
| **Plaintiff,** ) | |
| ) | **District Judge Lefkow** |
| **v.** ) | |
| ) | **Magistrate Judge Schenkier** |
| **BECTON, DICKINSON AND COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Baxter International, Inc. ("Baxter") has filed a motion to compel—its fourth in

this patent infringement litigation—asking us to order defendant Becton, Dickinson and Company

("BD") to (1) produce certain withheld and redacted communications involving employees of

Carmel Pharma AB (a Swedish company that BD acquired in 2011); and (2) produce documents

that a witness reviewed to refresh her recollection before testifying at a Rule 30(b)(6) deposition

(docs. ## 188, 190: Pl.'s Mot., at 1).[1] The motion has been fully briefed (*see* doc. # 203: Def.'s

Opp'n; doc. # 205: Pl.'s Reply). Our rulings on the motion are set forth below.[2]

---

[1] Baxter's motion also asks us to order BD to produce a deposition witness to testify for more than three hours about certain Rule 30(b)(6) topics and to produce various other documents about royalties, clinical training, and general warranty policies (Pl.'s Mot. at 15). Baxter forfeited these contentions by failing to develop them and, as such, we already denied that portion of Baxter's motion during the October 11, 2019 motion hearing (doc. # 196). *See, e.g., Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) (party forfeited an argument that "was perfunctory and underdeveloped").

[2] Baxter filed its motion and Exhibit B to its motion under seal (docs. ## 190, 193). If we refer to one of these sealed documents, we attempt to do so without revealing any information that could be reasonably deemed confidential. Nonetheless, to the extent we discuss confidential information, we have done so because it is necessary to explain the path of our reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality"); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

# I.

Baxter first seeks an order compelling BD to produce or remove redactions from more than 200 withheld or redacted documents that purportedly reflect legal advice provided to Carmel Pharma (the Swedish company acquired by BD) or its employees about patent-related issues (Pl.'s Mot. at 2-3, 5-10). We will refer to these documents as the Swedish Documents.[3] BD asserts that all of the Swedish Documents—except Withheld Document 154, for which BD does not provide a date—pre-date September 2010 (doc. # 188-2, at 2-13: Def.'s 5th Suppl. Privilege Log, at 1-2, 11; *id.*, at 14-27: Def.'s 5th Suppl. Redaction Log, at 1-11). BD has withheld or redacted the Swedish Documents on the basis of attorney-client privilege (Def.'s 5th Suppl. Privilege Log at 1-2, 11; Def.'s 5th Suppl. Redaction Log at 1-11).

Baxter contends that (1) Swedish law governs BD's assertion of attorney-client privilege over the Swedish Documents; and (2) this privilege assertion is improper because under Swedish law prior to September 2010, "communications between patent lawyers and their clients were not protected from disclosure by the attorney-client privilege" (Pl.'s Mot. at 6-10). BD counters that (1) the Swedish Documents are privileged under United States law; and (2) even if United States law does not apply, the Swedish Documents are likewise privileged under Swedish law (Def.'s Opp'n at 3-7).

## A.

We begin by addressing whether the law of Sweden or the law of the United States governs this privilege dispute. Courts in this district, as a matter of comity and as a functional approach to

---

[3] The Swedish Documents correspond to the following document entries from BD's Fifth Supplemental Privilege and Redaction Logs: Withheld Documents 1, 5, 9-11, 19-22, and 154, and Redacted Documents 1-177, 198, 199, 201, 202, 204-07, 209-12, 214-25, 227-30, and 234-49 (Pl.'s Mot. at 3).

the problem, "look to the foreign nation's law to determine the extent to which the [attorney-client] privilege may attach" to communications with foreign individuals. *SmithKline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 535 (N.D. Ill. 2000) (citing cases); *accord* Oct. 15, 2014 Order in *Alfdex AB v. Hengst SE & Co. KG*, No. 14 CV 50038, doc. # 172 ("*Alfdex* Order"), at 3. BD asserts, in contrast, that "courts typically consider whether the communications 'touch base' with the United States in determining which jurisdiction's law applies" (Def.'s Opp'n at 3 (citing *Cadence Pharms., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019 (S.D. Cal. 2014)).[4] But BD fails "to sincerely acknowledge [] that [c]ourts in this [d]istrict have decided to forego the 'touching base' test." *Alfdex* Order at 3. In any event, BD makes no attempt to explain how the Swedish Documents "touch base" with the United States (Def.'s Opp'n at 3). Instead, BD addresses "the communications challenged by Baxter under Sweden's laws" (*Id.*). Following the comity/functional approach utilized by courts in this district, we do as well, and we apply the law of the foreign nation, Sweden, to determine whether the Swedish Documents are protected by the attorney-client privilege.

## B.

Next, we must determine which communications are protected by the attorney-client privilege in Sweden. Each party has provided declarations setting forth its interpretation of

---

[4] We also note BD's assertion that in *In re Queen's University at Kingston*, 820 F.3d 1287, 1290-91 (Fed. Cir. 2016), the Federal Circuit concluded that its own "law governs the existence of privilege over communications between a foreign patentee and its non-attorney patent agents" (Def.'s Opp'n at 3). There is, however, no indication that the *In re Queen's University* court was asked to consider whether the law of Canada (where the patentee was located) governed the privilege dispute at issue, as opposed to U.S. federal law. Thus, *In re Queen's University* does not prohibit us from looking to Swedish law in these circumstances. *See Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) ("[W]ords of our opinions are to be read in the light of the facts of the case under discussion"); *LHO Chi. River, L.L.C. v. Perillo*, --- F.3d ----, 2019 WL 5851672, at *3 (7th Cir. Nov. 8, 2019) ("[O]ur silence in *Burford* should not be interpreted as a rejection of *Octane*'s extension to Lanham Act fee-shifting. As pointed out correctly by Defendants, the *Burford* parties never directed us to *Octane* in any of their filings").

Swedish law on this issue. *See Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 221 F. Supp. 2d 874, 884 (N.D. Ill. 2002) ("Foreign law is generally established by a declaration, an affidavit, or testimony of an expert on the law"). Baxter has provided declarations from Gabriela Burghelea Tomescu, an American patent attorney who has been employed as an American attorney and patent consultant by a Swedish law firm since June 2014 (doc. # 188-1: Tomescu Decl.; doc. # 205-1: Tomescu Reply Decl.). BD has provided the declaration of Karl-Arne Olsson, a Swedish attorney and *Advokat* who has worked at various major Swedish law firms since 1989 and who presently works as a senior consultant with one of the largest firms in Sweden (doc. # 203-1: Olsson Decl.). We have also performed our own research and analysis. *See Twohy v. First Nat. Bank of Chi.*, 758 F.2d 1185, 1193 (7th Cir. 1985) (urging courts "to research and analyze foreign law independently").

The following aspects of Swedish law do not appear to be in dispute. The Swedish Code of Judicial Procedure, which governs all civil matters in Sweden, affords an attorney-client privilege to certain classes of professionals as an exception to those professionals' obligations to give testimony and produce documents (Tomescu Decl., ¶¶ 8, 9; Olsson Decl., ¶¶ 2.1, 2.2, 2.4). One of these classes of professionals are *Advokats*—lawyers who have been admitted to the Swedish Bar Association (Tomescu Decl., ¶¶ 9, 10; Olsson Decl., ¶ 2.2). Patent attorneys in Sweden, however, are not members of the Swedish Bar Association and, as such, cannot be *Advokats* (Tomescu Decl., ¶ 10). Nor were patent attorneys, prior to September 2010, one of the classes to which the attorney-client privilege was extended (*Id.*, ¶¶ 9-11). However, on September 1, 2010, Sweden enacted the "Act on Authorization of Patent Attorneys" (the "Patent Attorney Act") (*Id.*, ¶ 12; Olsson Decl., ¶ 3.1). An amendment to the Code of Judicial Procedure introduced

the same day extended the attorney-client privilege to "authorized" patent lawyers and their assistants regarding patent matters (Olsson Decl., ¶¶ 2.2-2.4, 3.1).[5]

The sticking point is whether documents and communications authored or sent by patent attorneys *before* the enactment of the Patent Attorney Act are protected from production by the attorney-client privilege when sought after the September 2010 effective date of the Patent Attorney Act. BD's expert contends they are; Baxter's expert contends they are not. Neither expert directs us to any Swedish case law addressing either this specific issue or, more generally, whether Swedish statutes or amendments to the Code of Judicial Procedure are generally given retroactive effect. Moreover, both experts agree that the Patent Attorney Act itself does not state whether it extends the attorney-client privilege to documents or communications generated before September 1, 2010 (Tomescu Decl., ¶ 14; Olsson Decl., ¶ 3.2). In fact, Baxter's expert, Ms. Tomescu, relies heavily on this absence of an express statutory statement to opine that the Patent Attorney Act does not extend the attorney-client privilege to documents generated before its enactment (Tomescu Decl., ¶¶ 14, 15; Tomescu Reply Decl., ¶¶ 5, 10-12).

The absence of guiding case law or express statutory statements, however, does not conclusively decide the issue. BD's expert, Mr. Olsson, explains that "[f]ailing explicit answers in the statute itself, one needs to seek guidance [from] other sources of law" (Olsson Decl., ¶ 4.2). According to Mr. Olsson, preparatory works and, particularly, "explanations given by the legislator in the proposal to the [Swedish] parliament" (the "Proposition") are one "high ranking source" to be considered (*Id.*). Mr. Olsson also identifies the official government reports ("SOU")

---

[5] For simplicity, we refer to the Patent Attorney Act as extending the attorney-client privilege to authorized patent lawyers and their assistants, although strictly speaking, the corresponding amendment to the Code of Judicial Procedure did so.

preceding a Proposition as a legal source that "may offer guidance on the reasoning behind the language used in a statute" (*Id.*). Ms. Tomescu does not dispute, as a general matter, that Propositions and SOUs may be consulted when interpreting a Swedish statute (*see generally* Tomescu Reply Decl.).

Paragraph 4.2 of Mr. Olsson's declaration aligns with our own research. The phrase "preparatory works" refers to documents that are generated in the process leading to the enactment of a Swedish law. *See* Claes Broman & Max Granström, Int'l Civil Proc. Sweden § 1.3 (2003). "Legislative preparatory works have a rather important status in Sweden as a legal source[,]" as they "are considered to reveal the legislator's intentions, which can be used for interpreting a provision, if the provision is ambiguous or vague." *Id.*; Int'l Encyclopaedia of Laws: Cyber Law – Sweden, Ch. 1, § 4 (June 2019 update), *available at* 2019 WL 973995. Two types of preparatory works are the SOU and the Proposition. Int'l Encyclopaedia of Laws: Cyber Law – Sweden, Ch. 1, § 4. Before the Swedish government can draw up a legislative proposal, the matter in question must be analyzed and evaluated by an inquiry body, which then sets forth its conclusions in an official government report (SOU). *See* Gov't Offices of Sweden, Swedish legislation – how laws are made, https://www.government.se/how-sweden-is-governed/swedish-legislation---how-laws-are-made/ (last visited Nov. 21, 2019). After feedback is sought and received for the SOU, the responsible government ministry drafts a corresponding bill (Proposition) to present to the Swedish parliament. *See id.* SOUs and Propositions "often complement the rather abstract [Swedish] statutes by providing interpretation as well as examples of application of the law," and the Proposition, "in some cases together with the" SOU, "constitutes the most important part of the preparatory legislative works." Int'l Encyclopaedia of Laws: Cyber Law – Sweden, Ch. 1, § 4; Broman & Granström, Int'l Civil Proc. Sweden § 1.3.

## C.

Thus, Swedish law permits us to consider the other legal sources discussed by Mr. Olsson. The question now is whether these sources show that the expansion of attorney-client privilege created by the Patent Attorney Act extends to pre-September 2010 documents and communications, as Mr. Olsson contends (*see* Olsson Decl., ¶¶ 4.1-4.6, 5.1). We conclude that they do not.

Mr. Olsson construes Swedish law by quoting or restating portions of an official government report (SOU 2007:27) and a government bill (Proposition 2009/10:202) that are presumably part of the relevant preparatory works preceding the Patent Attorney Act and by referring to other purportedly supportive examples and legal sources (Olsson Decl., ¶¶ 4.3-4.6). Neither Mr. Olsson nor BD, however, provided us with translated copies of the legal sources that underlie Mr. Olsson's opinion (which are in Swedish), or even translations of the relevant portions of those sources. With translated copies, we could have more easily reviewed the legal sources and evaluated the context in which the passages quoted and referred to by Mr. Olsson are found. As BD contends that these Swedish legal sources support its withholding and redaction of more than 200 documents on the basis of attorney-client privilege, we expected BD to do more to justify this contention.

In any event, we start our analysis with paragraph 4.3 of Mr. Olsson's declaration. This paragraph quotes two passages from SOU 2007:27 that say that authorized patent attorneys should be exempt from testifying or producing documents concerning matters of patent law (Olsson Decl., ¶ 4.3). But the parties do not dispute that the Patent Attorney Act authorized this exemption; the relevant question is whether this exemption applies to documents generated before the Patent

Attorney Act's enactment in September 2010. Because these quoted passages from SOU 2007:27 do not shed any light on *this* question, they do not add anything to our analysis.

Next are paragraphs 4.4 and 4.5 of Mr. Olsson's declaration. Paragraph 4.4 quotes, from page 140 of SOU 2007:27, a passage stating: "The prohibition against asking questions also applies to things that have occurred before the enactment as long as the testimony is given after the enactment of the law. This follows from generally applicable principles of procedural law" (Olsson Decl., ¶ 4.4). The SOU purportedly states, in the same place, "that this also applies to the production of written documents as evidence[,]" but Mr. Olsson does not quote this purported statement (*Id.*). Paragraph 4.5 has a similar set-up. It quotes a passage from Proposition 2009/10:202 that addresses the testimonial prohibition and is nearly identical to the passage quoted in paragraph 4.4; then, without quoting the Proposition, Mr. Olsson declares that "[r]eference to even treatment of written evidence is made on the following page" (*Id.*, ¶ 4.5).

The passages from SOU 2007:27 and Proposition 2009/10:202 regarding the production of written evidence are the crucial ones for our analysis, so we question why Mr. Olsson failed to disclose the precise language of these passages—as he did with the passages regarding the prohibition against asking questions—and instead relied upon his own interpretation. Our own translation (using Google Translate) suggests that Mr. Olsson's interpretation is not supported by these written evidence passages. The cited but unquoted portions of the SOU and the Proposition regarding written evidence are identical, and they both (roughly) state, in relevant part, "[t]hat the prohibition on queries corresponds to an exemption from the duty to publish is evident from Chapter 38[,] Section 2 of the Code of Procedure." But these statements merely recognize that Chapter 38, Section 2 of the Judicial Code of Procedure extends the attorney-client privilege exception that is recognized for the provision of testimony to the production of written documents,

8

which Mr. Olsson already noted earlier in his declaration (*see* Olsson Decl., ¶¶ 2.2, 2.4). Contrary to what Mr. Olsson asserts, the SOU and Proposition statements to which he refers do *not* link or otherwise apply the stated retroactive intention for the testimonial prohibition to the written evidence prohibition.

In fact, the testimonial passages suggest that the authors of the SOU and the Proposition knew how to express their desire for retroactivity—which they did with respect to patent attorney testimony—when they wanted to do so. Their failure to explicitly state something to the effect that "the prohibition against the production of documents applies to documents authored before the enactment" does not strike us as an unintentional omission, and it makes us reluctant to further broaden the attorney-client privilege beyond the expansion already expressly authorized by the Patent Attorney Act (*cf.* Tomescu Reply Decl., ¶ 4 ("In Sweden, the attorney-client privilege is strictly a creature of statutory law")). Thus, we see nothing in paragraphs 4.4 and 4.5 that supports retroactively applying the attorney-client privilege "to documents already in existence as opposed to testimony given after the enactment of the law" (*see id.*, ¶¶ 10, 11).

Lastly, there is paragraph 4.6. In this paragraph, Mr. Olsson states:

> There are further examples of support of retroactive application of similar privileges in Chapter 36, Section 5, of the Procedural Code, *e.g.,* concerning legal counsels (who are not Advokat) and certain mediators. Both the preparatory work and the legal doctrine *i.e.,* Fitger et al, Commentary to "Rättegångsbalken", Chap. 36 Sec. 5, (published in Zeteo: 2019-06-27), clearly states that the rules apply to what has been entrusted or experienced prior to the enactment of the new rules.

(Olsson Decl., ¶ 4.6). But Mr. Olsson does not explain why the retroactive application of other privileges has any bearing on whether the privilege here—the attorney-client privilege for patent attorneys as it applies to written documents—should be retroactively applied. Perhaps the statutes by which these other privileges were recognized expressly state that the privileges are to extend

retroactively, which is not the case with the Patent Attorney Act. As for Mr. Olsson's second statement, we have no idea how "the legal doctrine *i.e.,* Fitger et al, Commentary to 'Rättegångsbalken', Chap. 36 Sec. 5, (published in Zeteo: 2019-06-27), clearly states that the rules apply to what has been entrusted or experienced prior to the enactment of the new rules." If this statement from this commentary was so clear, BD should have provided us with a translated version of the statement for us to consider. Even if we accepted the truth of this last statement, however, we cannot say that it resolves the issue here: whether the attorney-client privilege for patent attorneys protects documents generated before the enactment of the Patent Attorney Act.

We have also considered the practical implications of Mr. Olsson's opinion. If we were to accept Mr. Olsson's interpretation of Swedish law, the attorney-client privilege would indefinitely extend to *any* pre-September 2010 document that was authored or sent by an individual who, at some point, became an authorized patent attorney or assistant to such an attorney. Indeed, BD is withholding Swedish Documents from the mid-to-late 1990s and early 2000s based on Mr. Olsson's opinion (*see, e.g.*, Def.'s 5th Suppl. Privilege Log at 1 (Withheld Entries 1, 5, 9, 10, 11); Def.'s 5th Suppl. Redaction Log at 1-2 (Redacted Entries 1-21)). But during this timeframe (and even later), patent attorneys presumably did not give advice with any expectation that it would be privileged, as the bill proposing the extension of the attorney-client privilege to particular patent attorneys (Proposition 2009/10:202) was not even introduced until several years later (*see* Tomescu Reply Decl., ¶ 13 ("[B]ecause the Act did not go into effect until September 1, 2010, there would have been no legitimate expectation of privilege under Swedish law at the time the Swedish Entries were authored")). Without more of a showing from the relevant legal sources, we are not persuaded that the Swedish parliament intended to allow patent attorneys to withhold earlier communications that they had sent or authored with no reasonable expectation of privilege.

And because of the generally limited scope of Sweden's attorney-client privilege—remember, it only applies to particular classes of attorneys—we find it unlikely that the Patent Attorney Act broadly immunizes from discovery each and every communication from a patent attorney about patent matters that has ever taken place, which is the result to which Mr. Olsson's interpretation leads.

### D.

The two district court cases BD cites to support its position do not convince us otherwise (Def.'s Opp'n at 6 (citing *Alfdex* Order at 5 and *Lincoln Elec. Co. v. The Esab Grp., Inc.*, No. 2:15-cv-1404-JRG-RSP, 2016 WL 6804861, at *1 (E.D. Tex. Nov. 17, 2016))). Neither case is controlling authority, and we do not find the conclusions in either case to be persuasive. Although the *Alfdex* court stated that "the preparatory language . . . does allow for a retroactive application of the [Patent Attorney] Act," it only quoted the portion of the preparatory language that addressed the testimonial prohibition, and it did not explain why that language supported a retroactive application of the written evidence prohibition. *Alfdex* Order at 5. Similarly, the *Lincoln Electric* court did not explain why it found that communications sent by an attorney before she became an authorized patent attorney retroactively became privileged with the passage of the Patent Attorney Act—the court merely stated that it was convinced that this was "the better view of Swedish law." 2016 WL 6804861, at *1. Nor did the *Lincoln Electric* court elaborate on the content of the declaration about Swedish law that apparently supported this finding. *Id.* Given this lack of analysis, and the fact that we do not know precisely what evidence of Swedish law the *Alfdex* and *Lincoln Electric* courts considered, *Alfdex* and *Lincoln Electric* do not compel the result sought by BD.

11

In short, we find that Swedish law does not extend the attorney-client privilege authorized by the Patent Attorney Act to pre-September 2010 documents and communications. This finding means that BD must produce the Swedish Documents. BD has not shown that the undated Swedish Document (Withheld Document 154) was authored in September 2010 or later, and it does not dispute that all the other Swedish Documents pre-date September 2010. Moreover, BD does not argue that Withheld Document 10 should be withheld or otherwise produced in redacted form because it purportedly reflects advice from a United States attorney as well as a Swedish attorney (*see* Def.'s 5th Suppl. Privilege Log at 1). To justify its decision to withhold and redact the Swedish Documents, BD argued only that the attorney-client privilege in Sweden for patent attorneys extends to pre-September 2010 documents and communications (Def.'s Opp'n at 4-7). Our finding to the contrary forecloses this argument. We therefore order BD to produce and remove all redactions from the Swedish Documents.

## E.

Independent of our finding that the attorney-client privilege authorized by the Patent Attorney Act does not apply retroactively, we also make the following observations about BD's reliance on the attorney-client privilege to withhold or redact the Swedish Documents. *First*, some of the Swedish Documents are described as containing legal advice only from corporate counsel or a corporate legal department.[6] But "under Swedish law, communications between in-house counsel and other employees are not protected under the attorney-client privilege." *AstraZeneca*

---

[6] Redacted Documents 65, 66, 186, and 187 reflect advice from only Carmel Pharma's patent department; Redacted Document 95 reflects advice from only Carmel Pharma's legal counsel; and Redacted Documents 11, 12, 14-17, 19, and 20 reflect advice from Carmel Pharma's legal counsel "and/or SHL legal counsel" (Def.'s 5th Suppl. Redaction Log at 1, 2, 4, 5, 9). We presume "SHL legal counsel" refers to legal counsel for SHL Medical, which is an organization identified in the "Updated Cast of Characters" that accompanies BD's privilege and redaction logs. Neither party, though, explains the relationship (if any) between SHL Medical and Carmel Pharma.

*LP v. Breath Ltd.*, Civil No. 08-1512 (RMB/AMD), 2011 WL 1421800, at *8 (D.N.J. Mar. 31, 2011); *see also* Kevin Cranman & Natasha Baker, *Where in the World Are Your Employees? Institutions As Global Employers: Employment Law Considerations in the Age of International Programs*, 36 J.C. & U.L. 565, 575 n.29 (2010) ("[T]he attorney-client privilege is not recognized for Communications between in-house counsel and a corporate client in . . . Sweden"). Thus, absent evidence that the provider of the legal advice at issue otherwise qualifies for the attorney-client privilege, BD's redaction of these documents is improper for this additional reason.

*Second*, for many of the Swedish Documents, BD has only identified the provider of legal advice by the name of a Swedish patent law firm—Valea Technology & Law, Göteborgs Patentbyrå, or Ström & Gulliksson.[7] Yet, for all we know, the advice came from an individual at the firm who is not in a class of professionals to which Swedish law extends the attorney-client privilege. Thus, even if the attorney-client privilege did extend retroactively, BD's failure to identify "the name and capacity" of the individuals who gave the advice in these documents, which BD acknowledges should be done (Def.'s Opp'n at 4), would make it impossible to assess BD's privilege claim. *See Nucap Indus. Inc. v. Robert Bosch LLC*, No. 15 CV 2207, 2017 WL 3624084, at *1 (N.D. Ill. Aug. 23, 2017) ("[A] privilege log must describe a document specifically enough that a determination can be made as to whether it qualifies as privileged").

*Third*, numerous Swedish Document log entries exhibit both these flaws, as they describe the document as reflecting advice from Carmel Pharma's legal counsel, Valea Technology & Law,

---

[7] Withheld Document 19 and Redacted Documents 49, 61, 62, 67-72, 91-94, 96, 97, 99-102, 104, 114, 120, 124, 126, 129, 133, 135, 137, 140, 145, 148, 150, 152, 155, 159, 161, 164, 167, 170, 172, 174, 177, 198, 199, 201, 204-07, 209-12, 216, 217, 224, 225, 227, 228, 230, 234, 235, 237-39, 245, 247, and 248 reflect advice from Valea Technology & Law; Withheld Documents 1 and 11 and Redacted Document 5 reflect advice from Göteborgs Patentbyrå, and Redacted Document 22 reflects advice from Ström & Gulliksson (Def.'s 5th Suppl. Privilege Log at 1; Def.'s 5th Suppl. Redaction Log at 1-11). BD asserts that Göteborgs Patentbyrå became part of Valea Technology & Law around 2003 (Def.'s Opp'n at 6 n.3).

"and/or" Göteborgs Patentbyrå.[8] Merely identifying a document as reflecting legal advice from a law firm is insufficient, and BD's use of the "and/or" connector further obscures the identity or identities of the legal advice provider(s)—it could mean that all three entities provided the legal advice at issue, that only two did, or that only one did. This might not matter as much where all the listed providers of advice are protected by the attorney-client privilege, but that is not the case here. If Carmel Pharma's legal counsel is the only provider of legal advice, the communication is not protected by the attorney-client privilege in Sweden. And even if Carmel Pharma's legal counsel was not the only one to be involved in giving the legal advice at issue, it may be that under Swedish law, the involvement of Carmel Pharma's legal counsel waives any applicable privilege, although neither party addressed this issue.

*Lastly*, we note an insufficiency with BD's identification of Pontus Winqvist, Nils Ekström, or Ulf Holm as the provider of a Swedish Document or the advice contained therein.[9] BD has not shown that either Mr. Winqvist or Mr. Ekström was a patent attorney when he offered the legal advice at issue.[10] Notably, BD's "Updated Cast of Characters" that accompanies its privilege and redaction logs does not identify either Mr. Winqvist's or Mr. Ekström's title at the law firms where they worked, or the dates that they held these titles. True, Messrs. Winqvist and Ekström became *authorized* patent attorneys in November 2010 and August 2011, respectively (*see* Tomescu Decl.

---

[8] Redacted Documents 1-4, 6-10, 13, 18, 21, 23-48, 50-58, 60, 73, 80, 83, 85-89, 98, 117, 118, 121, 122, 130-32, 134, 139, 142, 144, 149, 154, 157, 158, 162, 163, 165, 166, 178-85, 190, 192-95, 200, 202, 208, 215, 231-33, and 240-44 fall into this category (Def.'s 5th Suppl. Redaction Log at 1-11).

[9] Withheld Documents 20-22, and 154 and Redacted Documents 63, 64, 74-79, 84, 90, 103, 105-13, 115, 116, 119, 123, 125, 127, 128, 136, 138, 141, 143, 146, 147, 151, 153, 156, 160, 168, 169, 171, 173, 175, 176, 191, 197, 203, 213, 223, and 226 were authored by or reflect advice from Mr. Winqvist; Withheld Documents 9 and 10 correspond to the same with respect to Mr. Ekström; and Withheld Document 5 was sent or authored, in part, by Mr. Holm (Def.'s 5th Suppl. Privilege Log at 1, 2, 11; Def.'s 5th Suppl. Redaction Log at 4-10).

[10] BD does not argue that Messrs. Winqvist and Ekström are or were *Advokats*.

Exs. 1-2), but this evidence does not say anything about when Messrs. Winqvist and Ekström first became patent attorneys. Likewise, Mr. Olsson's statement that Mr. Holm was employed by Göteborgs Patentbyrå as an assistant around 2000 does not show that Mr. Holm was an assistant to a patent attorney at that time (Olsson Decl., ¶ 5.2). Even had we found that the attorney-client privilege in Sweden extended to pre-September 2010 communications involving patent attorneys, we would not have extended it to advice given by individuals who had not yet become patent attorneys or who were not actually assisting patent attorneys.

## II.

Baxter also seeks an order compelling BD to produce documents that one of its witnesses reviewed in preparing for her deposition (Pl.'s Mot. at 3-4, 10-14). Jeanne Lukasavage, an in-house attorney at BD, was deposed under Federal Rule of Civil Procedure 30(b)(6) as BD's corporate witness for certain topics, including topics for which we previously ordered BD to produce a witness (Topics 6, 7, and 8) (doc. # 152: 7/26/19 Op., at 12, 16; doc. # 193: Pl.'s Mot. Ex. B ("Lukasavage Dep.") at 6:11-13, 27:11-29:19). Baxter also asserts, and BD does not dispute, that after Ms. Lukasavage's deposition, BD designated her testimony with respect to Rule 30(b)(6) Topic 5, which concerns BD's first knowledge or awareness of the patents-in-suit, as BD's corporate testimony (Pl.'s Mot. at 3-4 & n.1).

Ms. Lukasavage testified that, in preparation for her deposition, she reviewed documents that "refreshed [her] recollection" (Lukasavage Dep. at 9:14-17). Baxter seeks the production of the following documents that were reviewed by Ms. Lukasavage (the "Lukasavage Documents"): (1) memoranda containing legal advice rendered by outside counsel at WilmerHale in 2011; (2) invention disclosure records authored by Milan Ivosevic in June 2013; (3) an internal presentation related to the Carmel Pharma acquisition authored by Mony Ghose in 2011; (4) Ms. Ghose's

internal attorney notes concerning the work she was doing on the Carmel Pharma acquisition in 2011; and (5) a January 15, 2001 document described as "Memorandum re Patent Advice U.S. Patent 5,989,237" ("'237 Patent Memorandum"), which is also represented by Withheld Document 10 on BD's privilege log (Pl.'s Mot. at 4).[11] BD has withheld all the Lukasavage Documents on the basis of attorney-client privilege (*Id.*).

Baxter argues that Ms. Lukasavage used the Lukasavage Documents to refresh her recollection before testifying at her deposition and, therefore, BD must produce the documents despite their purportedly privileged status. For this argument, Baxter relies upon Federal Rule of Evidence 612. Under Rule 612, the use of a privileged document by a deposition witness to refresh her memory can waive the privilege and lead to the disclosure of the document. *The Manitowoc Co. v. Kachmer*, No. 14 C 9271, 2016 WL 4493454, at *8 (N.D. Ill. Aug. 26, 2016); *U.S. E.E.O.C. v. Cont'l Airlines, Inc.*, 395 F. Supp. 2d 738, 744 (N.D. Ill. 2005). When a deposition witness reviews a document to refresh her recollection before testifying, we will order the production of the document if "justice requires" it. Fed. R. Evid. 612(a)(2), (b); *see also* Fed. R. Evid. 612 advisory committee's note to 1974 enactment ("[T]he production of writings used by a witness to refresh his memory before testifying [is] discretionary with the court in the interests of justice").

"[T]he Seventh Circuit has not adopted a specific test governing when a witness's use of documents to prepare for a deposition warrants disclosure of such documents." *Africano v. Atrium Med. Corp.*, No. 17 CV 7238, 2019 WL 1294642, at *2 (N.D. Ill. Mar. 21, 2019). Baxter directs us to two cases—*Sporck v. Peil*, 759 F.2d 312 (3d Cir. 1985) and *James Julian, Inc. v. Raytheon Co.*, 93 F.R.D. 138 (D. Del. 1982)—that courts in our district have followed to decide this issue

---

[11] The '237 Patent Memorandum is one of the Swedish Documents, so we are already ordering its production. For completeness, though, we address Ms. Lukasavage's review of the document as well.

(Pl.'s Mot. at 11-12). *See, e.g., Africano*, 2019 WL 1294642, at *2 (following *Sporck*); *Reed v. Advocate Health Care*, No. 06 C 3337, 2008 WL 162760, at *1-2 (N.D. Ill. Jan. 17, 2008) (following *Raytheon*). For its part, BD relies heavily on the D.C. Circuit's reasoning in *In re Kellogg Brown & Root, Inc.* ("*In re KBR*"), 796 F.3d 137 (D.C. Cir. 2015), although BD does not identify any decisions from the Seventh Circuit or this district that have followed *In re KBR* (Def.'s Opp'n at 9-15).

We will use the framework set forth in *Sporck*, as it closely follows the language of Rule 612. *See Sporck*, 759 F.2d at 317 ("By its very language, Rule 612 requires that a party meet three conditions before it may obtain documents used by a witness prior to testifying"). *First*, we ask whether the witness used the document to refresh her memory. Fed. R. Evid. 612(a); *Sporck*, 759 F.2d at 317. *Second*, we ask whether the witness used the document for the purpose of testifying. *Sporck*, 759 F.2d at 317.[12] *Third*, we ask whether the interests of justice require us to order production of the document. Fed. R. Evid. 612(a)(2), (b); *Sporck*, 759 F.2d at 317. We address each inquiry in turn.

## A.

At her deposition, Ms. Lukasavage unambiguously testified that she reviewed the 2011 WilmerHale memoranda, the June 2013 invention disclosure records from Mr. Ivosevic, Ms. Ghose's 2011 internal presentation related to the Carmel Pharma acquisition, and Ms. Ghose's internal attorney notes about the Carmel Pharma acquisition to refresh her recollection (Lukasavage Dep. at 11:7-12:7, 12:21-17:13). Indeed, BD does not dispute that Ms. Lukasavage

---

[12] When *Sporck* was decided in 1985, the language of Rule 612 required the witness to use a writing "for the purpose of testifying." *Sporck*, 759 F.2d at 317. It appears that this language was removed from Rule 612 as part of the 2011 amendments, but those amendments were "intended to be stylistic only" and there was "no intent to change any result in any ruling on evidence admissibility." Fed. R. Evid. 612 advisory committee's note to 2011 amendments. Thus, we consider the "purpose of testifying" as part of the Rule 612 inquiry.

17

reviewed these documents to refresh her recollection. Ms. Lukasavage's testimony about the '237 Patent Memorandum is less clear (*see id.* at 97:20-100:14), but BD does not dispute that Ms. Lukasavage reviewed this document to refresh her recollection either.

BD, however, argues that Ms. Lukasavage did not "voluntarily" review the Lukasavage Documents to refresh her recollection. According to BD, Ms. Lukasavage needed to review these documents so she could provide corporate testimony about certain "privileged" Rule 30(b)(6) topics for which we ordered BD to produce a witness. Put another way, BD's position is that we compelled it to produce deposition testimony requiring the review of attorney-client privileged documents and, as such, it should not be found to have waived the privilege as to those documents (*see* Def.'s Opp'n at 9-13).

We are not persuaded. The ruling to which BD refers—our July 26, 2019 Memorandum Opinion and Order (doc. # 152)—did not compel BD to provide deposition testimony about privileged topics or matters. Rather, we compelled BD to provide a witness on "BD's patent clearance policies and procedures generally and as applied to the Accused Products" (Topic 6); "[a]ny efforts by BD to monitor or keep apprised of patents relevant to closed system drug transfer devices and/or the Accused Products" (Topic 7); and "[a]ny efforts by BD to monitor or keep apprised of patents assigned to its competitors, including but not limited to Baxter" (Topic 8) (7/26/19 Op. at 12, 16). As we explained, these Rule 30(b)(6) topics were "not drafted in such a way that questions within their scope would *inevitably* seek privileged information" (*Id.* at 14 (emphasis in original)). In fact, we made it clear that in questioning BD about these topics, Baxter was *not* entitled "to obtain Rule 30(b)(6) testimony from BD about information protected by the attorney-client or work-product privileges" (*Id.* at 16).

18

Nor did our July 26 Opinion force BD to show Ms. Lukasavage privileged documents to prepare for the Rule 30(b)(6) deposition. That was BD's counsel's choice. It is commonplace for a deposing attorney to ask a witness about the documents she reviewed to prepare or refresh her recollection for the deposition, so BD's counsel should have realized the risks in allowing Ms. Lukasavage to review privileged documents as part of her deposition preparation and, specifically, to refresh her memory. BD also does not explain why it was necessary for Ms. Lukasavage to review the Lukasavage Documents to be knowledgeable and prepared to testify about the Rule 30(b)(6) topics at issue, or why the factual information she needed in order to testify about these topics was unavailable from non-privileged sources.

BD's attempt to analogize this situation to *In re KBR* is misplaced (*see* Def.'s Opp'n at 9-12). In that case, the plaintiff noticed a Rule 30(b)(6) topic that addressed an issue the court deemed to be privileged: an internal investigation conducted by a company's lawyers. 796 F.3d at 140, 143-45. Because the noticed topic sought information about the substance of a privileged investigation, the deponent "had no choice but to review" privileged documents related to the investigation to adequately prepare for the Rule 30(b)(6) deposition. *Id.* at 144. The D.C. Circuit determined that Rule 612 did not require the production of the privileged documents reviewed by the deponent. *Id.* at 144-45. Relevant here, the *In re KBR* court concluded that requiring the production of these documents would allow a party to routinely defeat the privilege protections afforded to a company's internal investigation by noticing deposition topics on the privileged nature of the investigation. *Id.* The court also asserted that it made no sense to require the deponent to avoid reviewing privileged documents in preparing for his deposition, as that "would encourage entities to provide less knowledgeable corporate representatives for deposition." *Id.*

Unlike in *In re KBR*, the Rule 30(b)(6) topics here do not seek only privileged information. What is more, BD has not shown that Ms. Lukasavage "had no choice but to review" the Lukasavage Documents so that she could adequately prepare for the deposition. Thus, *In re KBR* is not helpful to BD's argument on this point.

In sum, BD provides us with no reason to conclude that Ms. Lukasavage *had* to review the Lukasavage Documents to testify knowledgeably about non-privileged matters within the scope of Topics 6-8 (or any other Rule 30(b)(6) topic). BD's counsel voluntarily decided to have Ms. Lukasavage review certain privileged documents to refresh her recollection. Moreover, this situation is nothing like one where a court orders a party to produce discovery that the party maintains is privileged. The first inquiry of our Rule 612 analysis is satisfied.

## B.

We next turn to the second inquiry: whether Ms. Lukasavage used the Lukasavage Documents for the purpose of testifying. This inquiry is related to the purpose of Rule 612, which is to allow a party to challenge a testifying witness's credibility and memory through cross-examination. *See Africano*, 2019 WL 1294642, at *2; *Cont'l Airlines*, 395 F. Supp. 2d at 744. If a document did not actually influence the witness's testimony, it "is of little utility for impeachment and cross-examination." *Sporck*, 759 F.2d at 317-18.

Because Ms. Lukasavage substantively testified about each Lukasavage Document or about subject matter that was likely addressed by the document, we conclude that Ms. Lukasavage's deposition testimony was affected and informed by her review of the Lukasavage Documents.

**The 2011 WilmerHale memoranda and Ms. Ghose's internal presentation and internal attorney notes about the Carmel Pharma acquisition.** Ms. Lukasavage testified about

the intellectual property due diligence preceding the Carmel Pharma acquisition (*e.g.*, Lukasavage Dep. at 48:4-10, 50:11-52:10, 54:5-59:17). Specifically, Ms. Lukasavage testified about what BD did to satisfy certain patent policy responsibilities with respect to its acquisition of Carmel Pharma, including how Ms. Ghose—a former BD employee who handled the intellectual property due diligence for the Carmel Pharma acquisition—worked with WilmerHale to obtain a legal opinion (presumably reflected by the 2011 WilmerHale memoranda Ms. Lukasavage identified) in connection with these responsibilities (*Id.* at 34:24-35:17, 35:22-36:14, 38:3-41:15, 50:22-51:1). But Ms. Lukasavage also testified that she was only "somewhat" or "partially" involved in the acquisition of Carmel Pharma and the corresponding due diligence—she "did some of the very preliminary work, and [she] was kept somewhat informed of what was going on during the diligence" (*Id.* at 34:17-23, 48:4-23). Moreover, Ms. Lukasavage did not speak or meet with Ms. Ghose in preparation for her deposition testimony (*see id.* at 7:12-9:5), and she did not identify any source of information other than the Ghose documents and the WilmerHale memoranda from which she could have attained the knowledge necessary to testify about Ms. Ghose's due diligence work and, specifically, Ms. Ghose's work with WilmerHale. Thus, it is plain that Ms. Lukasavage's testimony was informed by her review of Ms. Ghose's documents and the corresponding WilmerHale memoranda. *Cf. Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 265 F.R.D. 235, 243 (D. Md. 2010) (where a Rule 30(b)(6) deponent "testifies on topics of which he denies any personal knowledge, he is an 'empty vessel' and documents reviewed on those topics in preparation for the deposition necessarily informed his testimony").

**Mr. Ivosevic's June 2013 invention disclosure records.** Ms. Lukasavage testified that these documents made her aware of Baxter's '103 patent (Lukasavage Dep. at 89:2-7, 90:11-91:11, 95:3-7). Ms. Lukasavage further testified about these invention disclosure records to explain the

difference between dates identified on BD's privilege log for these documents and dates of patent awareness identified by BD in its interrogatory responses (*Id.* at 91:17-94:14). BD's counsel thereafter represented that BD would correct its interrogatory response so that it was "consistent with Ms. Lukasavage's testimony" (*Id.* at 94:16-25). Thus, not only did Ms. Lukasavage's review of the June 2013 invention disclosure records influence her deposition testimony, but it influenced BD's interrogatory responses.

**The '237 Patent Memorandum.** Ms. Lukasavage testified that she thought BD was able to identify Kjell Andreasson, the author of the '237 Patent Memorandum, as an employee of Carmel Pharma on its privilege log because something in the memorandum "indicate[d] that he was an employee of Carmel Pharma at the time of the memo" (Lukasavage Dep. at 98:7-17, 100:1-21, 101:14-22). As Ms. Lukasavage testified that she knew the contents of the '237 Patent Memorandum only "[a]s a result of preparing for [the] deposition" (*id.* at 100:1-14), her review of the document necessarily impacted this testimony.

Furthermore, we find it reasonable to infer that Ms. Lukasavage's testimony was influenced by the Lukasavage Documents even without these examples from her deposition testimony. In the context of a Rule 30(b)(6) witness, it is reasonable to infer "that documents selected by the corporation and provided to the witness to educate him or her on a particular topic is intended to (and thus is likely to) have an influence on the witness's testimony on that topic." *Adidas Am., Inc. v. TRB Acquisitions LLC*, 324 F.R.D. 389, 400 (D. Or. 2017) (concluding that, for Rule 30(b)(6) witnesses, there should "be a rebuttable presumption that the witness relied on the documents selected by the corporation (or its counsel) and then presented to the corporate representative to educate that witness on the noticed topics"). Here, although BD has not shown that it was *necessary* for its counsel to have Ms. Lukasavage review the Lukasavage Documents

to prepare for her Rule 30(b)(6) deposition, BD's counsel's choice to do so reflects an intent to have the documents influence Ms. Lukasavage's deposition testimony. And we find it likely that Ms. Lukasavage's review of the Lukasavage Documents, in fact, impacted her subsequent testimony in some way. Indeed, we note that Ms. Lukasavage did not testify (for example, in response to questioning from her own attorney) that her testimony was independent of or otherwise unaffected by her review of the Lukasavage Documents.

We find that Ms. Lukasavage used the Lukasavage Documents for the purpose of testifying at her deposition. Thus, the second Rule 612 inquiry is also satisfied.

## C.

Having found the first two inquiries of our Rule 612 analysis satisfied, we now ask whether justice requires BD to produce the Lukasavage Documents. In doing so, we must balance, on the one hand, the need to protect the attorney-client privilege and the desire to encourage thorough preparation of corporate deposition witnesses against, on the other hand, the need for the disclosure of documents to allow a witness to be fully examined. *See Adidas Am.*, 324 F.R.D. at 397-98; *Heron Interact, Inc. v. Guidelines, Inc.*, 244 F.R.D. 75, 77 (D. Mass. 2007).

Protecting the attorney-client privilege is of course important, as its purpose "is to encourage full disclosure and to facilitate open communication between attorneys and their clients." *United States v. BDO Seidman*, 337 F.3d 802, 810 (7th Cir. 2003). So, too, is it important for a corporation to fully prepare the witnesses who will be deposed on its behalf. A corporate party "has a duty to make a good faith, conscientious effort to designate appropriate persons and to prepare them to testify fully and non-evasively about the subjects" identified in a Rule 30(b)(6) notice. *Seaga Mfg., Inc. v. Intermatic Mfg. Ltd.*, No. 13 C 50041, 2013 WL 3672964, at *2 (N.D. Ill. July 12, 2013). If the party fails to do so, it frustrates its opponent's ability "to obtain the fullest

possible knowledge of the issues and facts before trial," *see Hickman v. Taylor*, 329 U.S. 495, 501 (1947); *In re KBR*, 796 F.3d at 144-45, and the corporate party will have to designate, prepare, and make available additional witness(es) for deposition, *Seaga Mfg.*, 2013 WL 3672964, at *2, causing both parties to spend more time and money.

At the same time, "[p]arties have a heightened need to discover documents used to prepare witnesses designated under [Rule] 30(b)(6)," as "the substance of their testimony may be based on sources beyond personal knowledge." *Adidas Am.*, 324 F.R.D. at 397 (internal quotations omitted). This need is particularly heightened when a corporation uses privileged documents to prepare its witness; prohibiting the cross-examining party from seeing those documents because of attorney-client privilege would encourage "parties to use privileged documents to prepare witnesses as a means of limiting the preparation of the cross-examiner." *Id.* at 397-98 (internal quotations omitted). As the court in *Adidas America* explained:

> A corporate designee could testify only as to information and communications that are advantageous. Other information that would contradict the testimony or undermine the corporation's position and was contained in the documents could be ignored, and the opposing party would have no way of knowing how to test or challenge the corporate designee's testimony.

*Id.* at 398.

We find that justice requires BD to produce the Lukasavage Documents. Without access to the Lukasavage Documents, Baxter cannot know whether Ms. Lukasavage's testimony ignored or misinterpreted certain information contained within these documents, and Baxter should have the opportunity to test and challenge her testimony with these documents in hand. *See Adidas Am.*, 324 F.R.D. at 397-98. Moreover, as discussed above, we are not convinced that Ms. Lukasavage had to review the Lukasavage Documents to adequately prepare for her deposition. Indeed, BD fails to explain why Ms. Lukasavage had to review the substance of any one of the Lukasavage

Documents to be knowledgeable about the Rule 30(b)(6) topics (Topics 6, 7, and 8) for which we compelled BD to produce a witness. Merely asserting that this was necessary without explanation, as BD has done, is not enough.

The attorney-client privilege, despite its undisputed importance, can be waived. *The Manitowoc Co.*, 2016 WL 4493454, at *8; *BSP Software, LLC v. Motio, Inc.*, No. 12 C 2100, 2013 WL 3456870, at *2 (N.D. Ill. July 9, 2013). Here, BD's counsel failed to "carefully guard[]" its client's attorney-client privilege (Def.'s Opp'n at 14) when it refreshed Ms. Lukasavage's recollection using the Lukasavage Documents, thereby injecting privileged material into the case. A finding of waiver, *i.e.*, the production of the Lukasavage Documents, is appropriate in these circumstances.

Because we have answered all three of the Rule 612 inquiries in the affirmative, we order BD to produce the Lukasavage Documents. To be clear, BD's waiver of the attorney-client privilege is limited only to the Lukasavage Documents. We do not find a subject matter waiver or other broad waiver of the attorney-client privilege or work-product doctrine.[13]

---

[13] BD suggests—in one clause in one sentence in its brief—that the Lukasavage Documents include "opinion work product protected by Fed. R. Civ. P. 26(b)(3)" (Def.'s Opp'n at 15), but BD's privilege and redaction logs do not identify any documents withheld or redacted on the basis of work product (*see generally* Def.'s 5th Suppl. Privilege Log; Def.'s 5th Suppl. Redaction Log). BD has forfeited any work product argument by failing to assert work product as a basis for withholding or redacting documents in its logs and by raising the issue only in an undeveloped assertion in its brief. But even if the Lukasavage Documents contain work product, our Rule 612 analysis would not be changed.

## <u>CONCLUSION</u>

Accordingly, Baxter's fourth motion to compel (docs. ## 188, 190) is granted in part and denied in part. The parties shall consult with each other to reach agreement on a date for BD to produce the documents and information required by this order and shall, by the close of business on December 4, 2019, file a report proposing a date by which that production will be completed.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: November 22, 2019**